AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
### for the
### Western District of New York

United States of America

v.

ARCIDEZ CASTILLOS-DIGUEZ,
a/k/a ARCIDES DIEGUEZ-CASTILLOS

Case No. 23-MJ-4098

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of May 23, 2023, in the Western District of New York, the defendant, ARCIDEZ CASTILLOS-DIGUEZ a/k/a ARCIDEZ DIEGUEZ-CASTILLOS, did knowingly, intentionally, and unlawfully possess with intent to distribute, 400 grams or more of a mixture and substance containing fentanyl, a Schedule II controlled substance, in violation of **Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)**.

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

_____
Complainant's signature

RYAN MOORE, Task Force Officer
DRUG ENFORCEMENT ADMINISTRATION

_____
Printed name and title

Sworn to before me and signed in my presence.

Date: 5/23/2023

City and State:  Rochester, New York

_____ 5/23/23 at 1:57 p.m.
Judge's signature

HONORABLE MARIAN W. PAYSON
UNITED STATES MAGISTRATE JUDGE

_____
Printed name and title

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v-                                                                 AFFIDAVIT

ARCIDEZ CASTILLOS-DIGUEZ                          23-MJ- 4098
a/k/a ARCIDES DIEGUEZ-CASTILLOS,

Defendant.

---

State of New York  )
County of Monroe  ) ss
City of Rochester  )

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, RYAN MOORE, being duly sworn, depose and state:

1. I am a Sheriff's Deputy employed by the Monroe County Sheriff's Office, currently assigned as a Task Force Officer to the Drug Enforcement Administration (DEA). I have been in Law Enforcement since February of 2013 and have been involved in narcotics investigations for over five years with over ten years of experience in narcotics related investigations. I have been involved in numerous narcotics and controlled substance arrests and I have participated in a number of successful investigations of illicit drug distribution networks and have interrogated many defendants, informants, and others who were either, sellers, distributors, or users of narcotics and other illicit drugs. I have assisted with, and have been the lead case agent and Affiant on, Title III wiretap investigations which have led to successful felony convictions of narcotic sales, narcotic possession, weapon offenses and murder. As a result of this background, I am familiar with the jargon of narcotics and other

1

illicit drug trafficking and the way narcotics and other illicit drug users and sellers seek to disguise activity relating to drug trafficking. I have been instructed in the use of, and practical application of field testing by senior narcotics investigators. I have had the opportunity to check the results of my field tests with the Monroe County Crime Laboratory and can state that I have been correct in 100% of the field tests I have conducted and verified.

    a. I have attended the following courses, all of which have been directly related to criminal and narcotics investigations:

    i. 2013 – Basic Narcotics Identification course at the Monroe County Public Training Facility. Topics covered: identification of narcotics, jargon and pricing of narcotics, narcotic packaging identification and field testing.

    ii. 2018 – Advanced Undercover Techniques and Survival sponsored by the Monroe County Public Safety Training Center in Rochester, New York. Topics covered: covert operations, planning undercover operations, undercover survival and officer safety techniques.

    iii. 2018 – Advanced Vehicle Concealed Compartment Course sponsored by Hilbert College in Buffalo, New York. Topics covered: detailed and comprehensive vehicle searches, recognition and identification of common masking techniques used by narcotics transporters, identification of concealed compartments used to transport narcotics and bulk currency.

    iv. 2021 – Mid-Level Narcotics Investigations sponsored by Hilbert College in Buffalo, New York. Topics covered: Mid-level enforcement philosophy, structure of mid-level investigations, building a mid-level conspiracy investigation, identification of overt acts, the use of confidential informants

during mid-level investigations.

2. Based upon my training, experience and participation in this and other drug and firearms trafficking investigations and based upon my conversations with other experienced narcotic agents with whom I am associated, I know:

a. That drug traffickers very often place assets in names other than theirs to avoid detection, seizure, and forfeiture of these assets by government agencies; In additional to placing assets in names of other individuals, drug traffickers often utilize multiple residences to stash and conceal their bulk narcotic product and narcotic proceeds.

b. That even though these assets are in other persons names, drug traffickers continue to use these assets and residences and exercise dominion and control over them;

c. That drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, cashier's checks, correspondence, computer records, and other documents and items related to the manufacture, transportation, ordering, possession, sale, and distribution of drugs. These documents and items are often maintained at the suspect's residence;

d. That it is common for drug dealers to hide contraband proceeds of drug sales, and records of drug transactions in secure locations within their residences for ready access and to conceal them from law enforcement authorities.

e. That drug traffickers commonly maintain addresses or telephone numbers in cellular telephones, books or papers which reflect names, addresses,

and/or telephone numbers of their current and past associates in the drug trafficking organization. In connection trafficking investigations, I have participated in the execution of in excess of 100 search warrants at the residences and/or business locations of drug traffickers and have frequently found notes, books, ledgers and computer files reflecting names, addresses and other personal identifying information drug associates;

f. That drug traffickers take or cause to be taken photographs or video movies of themselves, their coconspirators, and their property and assets purchased with drug proceeds which are normally kept by drug traffickers in their possession and/or in their residence;

g. That drug traffickers commonly have in their possession (on their person or at their residence), ammunition, firearms, including, but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Said firearms are most often used and/or maintained in order to protect and secure a drug traffickers person and property;

h. That drug traffickers usually keep paraphernalia for packing, diluting, weighing, manufacturing and distributing their drugs. That paraphernalia includes, but is not limited to, scales, plastic bags, and diluting agents;

i. That drug traffickers often attempt to legitimize their profits from the sale of drugs. To accomplish these goals, drug traffickers utilize, for example, foreign banks, domestic banks, and their attendant services, cashier's checks, money drafts, real estate, and real and fictitious businesses;

j. That persons involved in drug trafficking often conceal in their residences,

and residences of others, quantities of drugs, large amounts currency, financial instruments, precious metals, jewelry, and other articles of value which are the proceeds of drug transactions and evidence of financial transactions, relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in drug trafficking activities.

3. This affidavit is submitted in support of a criminal complaint against Arcidez CASTILLOS-DIGUEZ a/k/a Arcides DIEGUEZ-CASTILLOS (hereinafter "CASTILLOS-DIEGUEZ") for violations of Title 21, United States Code, Sections 841(a)(1) (Possession with Intent to Distribute, 400 grams or more of a mixture and substance containing fentanyl, a Schedule II controlled substance). The assertions made herein are based solely upon my personal knowledge or upon information I have received from this investigation. Further, I have had discussions with officers involved in this investigation who have confirmed the accuracy of the information contained within this affidavit. Since this affidavit is being submitted for a limited purpose, I have not included each and every fact that I know concerning this investigation. Rather, I have set forth only those facts that relate to the issue of whether probable cause exists to believe that the defendant committed the above-mentioned offenses. In support thereof, I respectfully state the following:

### Execution of New York State Search Warrants and Arrest of CASTILLOS-DIEGUEZ

4. On May 23, 2023, members of the Drug Enforcement Administration (DEA) Rochester Resident Office, Rochester Police Department (RPD), and Greater Rochester Area Narcotics Enforcement Team (GRANET) executed New York State search warrants at 438 Avenue A, Rochester, New York, at 1549 East Main Street, Rochester, New York, at 241 Durnan Street, Rochester, New York, on the black 2003 BMW 745i, bearing New York State registration KSK2577 (hereafter "Target Vehicle"), and on CASTILLOS-DIEGUEZ's person.

5. During the search of 438 Avenue A, the residence was found to be occupied by CASTILLOS-DIEGUEZ, along with five other individuals. CASTILLOS-DIEGUEZ was located in the master bedroom. Evidence that was located and seized from 438 Avenue A includes: approximately 124 small Ziploc-style bags containing a powdery substance (located beneath the exterior siding on the rear of the residence), $737.00 U.S. Currency in CASTILLOS-DIEGUEZ' pocket, multiple cellular telephones, a DVR system for surveillance cameras in a living room, documents in CASTILLOS-DIEGUEZ' name in master bedroom, set of numerous keys on a key ring located on the master bedroom floor. Keys found on this key ring were subsequently found to operate door locks at 438 Avenue A, 1549 East Main Street, and 241 Durnan Street. The 124 small Ziploc-style bags containing a powdery substance were found to have an approximate weight of 12 grams (including drug packaging). A drug field test was conducted on a sample taken from this powdery substance, which did yield a positive result for the presence of fentanyl.

6. During the search of 1549 East Main Street, the residence was found to be unoccupied. Evidence that was located and seized from 1549 East Main Street includes:

approximately 201 small Ziploc-style bags containing a powdery substance packaged together inside of larger Ziploc-style bags (located in a kitchen cabinet), three cellular telephones (located in the bedroom closet drawer), along with numerous documents in the kitchen, dining room, and bedroom closet. The documents included a vehicle registration in the name of "DIEGUEZ-CASTILLOS, A", mail addressed to another individual at 1549 East Main Street, mail addressed to that same individual at 438 Avenue A, mail addressed to "A DIEGUEZ CASTILLOS" at 25 Kosciusko St with "241 Durnan sT" handwritten on the envelope, mail addressed to "DIEGUEZCASTILLO ARCIDES" at 104 Morril Street. Additionally, multiple prescription medication bottles in CASTILLOS-DIEGUEZ's name were found in the bedroom closet. The 201 small Ziploc-style bags containing a powdery substance were found to have an approximate weight of 11 grams (including drug packaging). A drug field test was conducted on a sample taken from this powdery substance, which did yield a positive result for the presence of fentanyl.

7.      During the search of 241 Durnan Street, the residence was found to be unoccupied. Evidence that was located and seized from 241 Durnan Street includes:

   a. Four packages containing a powdery substance was, located in a kitchen cabinet. These packages were observed to weigh approximately 2,758 grams (total including drug packaging). A drug field test was subsequently conducted on each of the packages, each yielding a positive result for the presence of fentanyl.

   b. Three plastic bags containing a powdery substance, located in a kitchen cabinet. These bags were observed to weigh approximately 881 grams (including drug packaging). A drug field test was subsequently conducted

on a sample taken from these bags, which yielded a positive result for the presence of heroin.

c. Several hundred small Ziploc-style bags containing a powdery substance, located on the kitchen counter. These Ziploc-style bags were observed to weigh approximately 106 grams (total including drug packaging). A drug field test was subsequently conducted on a sample taken from these bags, which yielded a positive result for the presence of fentanyl.

d. A clear knotted bag containing a powdery substance, located on the kitchen counter. This powdery substance was found to weigh approximately 6 grams (including drug packaging). A drug field test was subsequently conducted on a sample taken from this bag, which yielded a positive result for the presence of cocaine.

e. Five knotted clear plastic bags containing a powdery substance and package containing a powdery substance, located on the dining room table. This powdery substance was found to weigh approximately 926 grams (including drug packaging). A drug field test was conducted on each of these six powdery substances, each yielding a positive result for the presence of fentanyl.

f. A clear knotted plastic bag containing a powdery substance, located on the dining room table. This powdery substance was found to weigh approximately 21 grams (including drug packaging). A drug field test was subsequently conducted on a sample taken from this bag, which yielded a positive result for the presence of cocaine.

g. Several hundred small Ziploc-style bags containing a powdery substance, located on the dining room table. This substance was found to weigh approximately 83 grams (including drug packaging). A drug field test was subsequently conducted on a sample taken from these bags, which yielded a positive result for the presence of fentanyl.

h. Several digital scales with powdery residue on them were located throughout the residence.

i. New/unused small Ziploc-style bags in various colors were located on the kitchen counter and dining room table. These bags are consistent in appearance with those also found at 438 Avenue A and 1549 East Main Street.

j. An electric blender, dinner plate, and other drug processing materials, all with powdery residue, were located on the dining room table.

k. Numerous bags containing unknown powdery substances were located in a kitchen cabinet.

l. Documents in CASTILLOS-DIEGUEZ' name were located on the kitchen counter and dining room table. Prescription medication bottles in CASTILLOS-DIEGUEZ's name were located on the kitchen counter. A receipt for rent payment for 25 Kosciusko Street in CASTILLO-DIEGUEZ' name was located on the kitchen counter.

m. A cellular telephone located in the laundry room.

n. A DVR for surveillance cameras affixed to the residence was located in the living room.

### CASTILLOS-DIEGUEZ's Statement

8.     CASTILLOS-DIEGUEZ was transported to the Rochester Police Department where he was interviewed after waiving his Miranda Rights. During the interview, CASTILLOS-DIEGUEZ stated, in sum and substance, that he is the only person who goes to 241 Durnan Street, no one else stays there, and that anything found in that residence is his. CASTILLOS-DIEGUEZ also stated, in sum and substance, that the fentanyl found at 1549 East Main Street was also his.

### Surveillance of CASTILLOS-DIEGUEZ

9.     On April 6, 2023 Agents were conducting physical and digital surveillance in the areas of 1549 East Main Street, 438 Avenue A, and 241 Durnan Street in Rochester, New York. These locations are where your affiant believes CASTILLOS-DIEGUEZ spends the night, where he operates his narcotics trafficking operation. At approximately 9:29 a.m., Agents observed a black 2011 Toyota Sienna, bearing New York State registration KPN1055 (hereafter "Toyota Sienna"), known by Agents to be utilized CASTILLOS-DIEGUEZ but registered to another individual, parked in the driveway of 1549 East Main Street. At approximately 10:24 a.m., CASTILLOS-DIEGUEZ was observed exiting the front door of 1549 East Main Street and departing in the Toyota Sienna. CASTILLOS-DIEGUEZ was observed turning around and returning to 1549 East Main Street, where CASTILLOS-DIEGUEZ was observed entering the front door. At approximately 10:38 a.m., Agents observed CASTILLOS-DIEGUEZ exit the front door and use a set of keys to lock the door. Agents then observed CASTILLOS-DIEGUEZ depart in the Toyota Sienna. Surveillance was maintained on CASTILLOS-DIEGUEZ as he traveled directly to 241 Durnan Street.

CASTILLOS-DIEGUEZ was then observed (by way of a nearby surveillance camera) utilizing a set of keys to open the driveway side door and entering the residence. Approximately 50 minutes later, CASTILLOS-DIEGUEZ was observed exiting the same door, now wearing different clothing. Surveillance was maintained on CASTILLOS-DIEGUEZ as he departed driving the Toyota Sienna directly to 438 Avenue A, where Agents observed CASTILLOS-DIEGUEZ utilizing a set of keys to open and enter the rear driveway side door of 438 Avenue A.

10. On April 13, 2023, at approximately 8:14 a.m., Agents observed the Target Vehicle parked in the driveway of 1549 East Main Street. At approximately 9:02 a.m., Agents observed (via surveillance camera) CASTILLOS-DIEGUEZ arrive at 438 Avenue A in the Target Vehicle. Agents observed CASTILLOS-DIEGUEZ park in front of the location, walk up the driveway, and enter the rear driveway side door. Agents then observed CASTILLOS-DIEGUEZ meet with an unidentified male in the driveway of 438 Avenue A. At approximately 10:45 a.m., Agents observed CASTILLOS-DIEGUEZ standing in front of 438 Avenue A utilizing two cellular telephones. Based upon your affiant's training and experience in this and other investigations, your affiant knows that it is common practice for narcotics traffickers to utilize multiple cellular telephones in an effort to conceal their activities and deter law enforcement detection. At approximately 10:50 a.m., CASTILLOS-DIEGUEZ was observed departing 438 Avenue A on a motorcycle. Surveillance was maintained as CASTILLOS-DIEGUEZ traveled to the area of North Clinton Avenue and Evergreen Street, Rochester, New York, an area which Agents known to be a well-known open air drug market where fentanyl, cocaine, and other controlled substances are routinely purchased and sold. Agents observed CASTILLOS-DIEGUEZ meeting with multiple unidentified males in this

area before departing on the motorcycle. At approximately 10:58 a.m., Agents observed CASTILLOS-DIEGUEZ travel directly to 241 Durnan Street. Agents observed CASTILLOS-DIEGUEZ (via nearby surveillance camera) utilize a set of keys to open the driveway side door of 241 Durnan Street and enter the residence.

11. On April 15, 2023, Agents observed (via nearby surveillance camera) CASTILLOS-DIEGUEZ arrive at 438 Avenue A in the Target Vehicle at approximately 10:11 a.m. CASTILLOS-DIEGUEZ was then observed exiting the vehicle and meeting with an unknown male in front of the residence. At approximately 11:17 a.m., CASTILLOS-DIEGUEZ and the unidentified male had a brief interaction that was consistent with what your affiant believes, based upon your Affiant's training and experience in this and other investigations, to be a hand-to-hand narcotics transaction. Agents then observed CASTILLOS-DIEGUEZ walk toward the driveway side door of 438 Avenue A.

12. On April 16, 2023, Agents observed (via nearby surveillance camera) CASTILLOS-DIEGUEZ arrive at 438 Avenue A in the Target Vehicle at approximately 11:15 a.m. CASTILLOS-DIEGUEZ was then observed exiting the Target Vehicle and meeting with an unidentified male on the southern sidewalk of Avenue A. CASTILLOS-DIEGUEZ and the unidentified male had a brief interaction that, based upon your Affiant's training and experience in this and other investigations, was consistent with a hand-to-hand narcotics transaction. The unidentified male appeared to hand CASTILLOS-DIEGUEZ a quantity U.S. Currency, which CASTILLOS-DIEGUEZ appeared to count. The unidentified male departed and CASTILLOS-DIEGUEZ then walked toward the driveway side door of 438 Avenue A.

13. On April 22, 2023 and April 23, 2023, Agents observed (via nearby surveillance camera) CASTILLOS-DIEGUEZ sitting in the driver's seat of the Target Vehicle at 438 Avenue A. On numerous occasions over these two days, Agents observed unidentified individuals arrive to the area of 438 Avenue A, enter the Target Vehicle for approximately one minute or less, then depart. Based upon your Affiant's training and experience in this and other investigations, your Affiant believes this behavior to be consistent with that of individuals who are engaged in illegal narcotics transactions.

14. CASTILLOS-DIEGUEZ has been observed (via a combination of physical surveillance and nearby surveillance cameras) entering and exiting 438 Avenue A and 241 Durnan Street utilizing keys on a near-daily basis for the past approximately 30 days. CASTILLOS-DIEGUEZ has also been observed at 1549 East Main Street multiple times per week for the past approximately 30 days, including occasions when CASTILLOS-DIEGUEZ has spent the night at 1549 East Main Street.

15. Based on my training, experience, and knowledge of the investigation to date including the large amounts of fentanyl recovered from the above described locations, I believe the defendant possessed the above described fentanyl, with the intent of distributing it. These amounts are far in excess of what an individual drug user would possess.

## Conclusion

16.     Based on the above information, your affiant submits there is probable cause to believe that on or about, May 23, 2034, in the City of Rochester, Western District of New York, Arcidez CASTILLOS-DIEGUEZ violated Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A), that is, possession with intent to distribute, 400 grams or more of a mixture and substance containing fentanyl, a schedule II controlled substance.

_____
RYAN MOORE
Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed to before me
this 23rd day of May, 2023.

_____
HONORABLE MARIAN W. PAYSON
United States Magistrate Judge